IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHERYL L. BJORNSON, ) | Case No. CV 04-0285-N-MHW |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM DECISION** |
| v. ) | **AND ORDER** |
| ) | |
| DAVE SMITH MOTORS/FRONTIER ) | |
| LEASING AND SALES, ) | |
| ) | |
| Defendant. ) | |
| ———————————————— ) | |

Currently pending before the Court is Defendant Dave Smith Motors/Frontier Sales and

Leasing's Renewed Motion for Directed Verdict or, in the alternative, Motion for New Trial

and/or Remittitur (Docket No. 91), filed March 27, 2008; and Plaintiff Sheryl Bjornson's Motion

for Fees and Costs (Docket No. 94), filed March 31, 2008.

**I.**
**Background**

Plaintiff Sheryl Bjornson ("Plaintiff") filed this lawsuit on June 8, 2004, against

Defendant Dave Smith Motors/Frontier Sales and Leasing ("Defendant"), bringing claims of a

sexually hostile work environment, gender discrimination, and retaliation under Title VII of the

Civil Rights Act of 1964.  Complaint, Docket No. 1.  On September 12, 2007, this Court entered

summary judgment in favor of Defendant on Plaintiff's claim of gender discrimination and

retaliation.  Memorandum Decision and Order, Docket No. 59.  The remaining claim for a

sexually hostile work environment was tried to a jury February 26-29, 2008 in Coeur d'Alene,

Idaho.  The jury returned a verdict in favor of Plaintiff, awarding nominal damages in the

amount of $1.00 and assessing punitive damages in the amount of $100,000.00.  Special Verdict,

Docket No. 88-2.  Defendant has brought a post-trial motion for a direct verdict, new trial and/or

remittitur.  Plaintiff has filed a motion for fees and costs.

## II.
## Defendant's Renewed Motion for a Direct Verdict or for a New Trial and/or Remittitur

### A.    Legal Standard - Judgment as a Matter of Law/New Trial

Federal Rule of Civil Procedure 50(b) permits a party to file a renewed motion for

judgment as a matter of law following trial.  A jury's verdict must be upheld if it is supported by

substantial evidence.  *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

Substantial evidence is "evidence adequate to support the jury's conclusion, even if it is also

possible to draw a contrary conclusion from the same evidence."  *Id.* (quoting *Johnson v.

Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001)).  The court should

"simply ask whether the plaintiff has presented sufficient evidence to support the jury's

conclusion."  *Id.*  The court must review the entire evidentiary record, but "must disregard all

evidence favorable to the moving party that the jury is not required to believe."  *Id.*  Judgment as

a matter of law is "proper if the evidence, construed in the light most favorable to the nonmoving

party, permits only a conclusion contrary to the jury's verdict."  *McLean v. Runyon*, 222 F.3d

1150, 1153 (9th Cir. 2000).  When ruling on the motion, the court may:  (1) allow judgment on

the verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.  Fed. R.

Civ. P. 50(b).

**Memorandum Decision and Order - Page 2**

Federal Rule of Civil Procedure 59(a) provides that a new trial may be granted "on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."

B.     **Hostile Work Environment**

Defendant contends that there is not substantial evidence to support the jury's verdict finding that Plaintiff was subjected to a hostile work environment.  Defendant submits that Plaintiff's evidence merely consists of a few isolated incidents including:  (1) Mr. Orsi used profanity (by referring to Plaintiff and her family as "that f-ing Sheryl" and "Sheryl's f-ing kids"); (2) he hugged and rubbed the shoulders of other female employees, which was not directed at Plaintiff, not sexual in nature, nor unwelcome; (3) Mr. Orsi's comment that he was going to have sex with Carrie Adamovich and that it would be the new rumor of the week; (4) the photograph of Mr. Orsi and other co-workers in which he stuck his finger through the zipper of his pants to depict a penis; and (5) Mr. Orsi nicknamed Plaintiff "half-rack," a reference to her breast size.  Defendant maintains that this evidence does not meet the standard for a sexually hostile work environment because much of it was not directed at Plaintiff, was not unwelcome and did not have an impact on Plaintiff's terms and conditions of employment.

Plaintiff submits that there is sufficient evidence from which the jury could have concluded that she was subjected to a hostile work environment.  This includes testimony that: Mr. Orsi asked Plaintiff out on dates and once she turned him down, he demeaned her and her family by calling them "f-ing Sheryl" and "Sheryl's f-ing kids;" Mr. Orsi referred to Plaintiff as "half-rack;" Plaintiff watched Mr. Orsi touch female employees; Plaintiff had to listen to Mr.

Orsi's sexual exploits; Plaintiff was told by her supervisors to go along with Mr. Orsi's conduct if she wanted to keep her job; Plaintiff received a written warning for her attire after she had complained to her supervisors about Mr. Orsi; Mr. Orsi used foul language and told explicit jokes at work; Plaintiff viewed a photograph of Mr. Orsi simulating a penis with his finger, among other incidents.  Plaintiff also kept a journal in which she wrote down examples of Mr. Orsi's conduct.  This journal described incidents including:  Mr. Orsi disparaging Plaintiff's credit at a paint store; the photograph described above; that Plaintiff was subjected to rumors about Mr. Orsi's sexual exploits, etc.

Under Title VII, it is "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII's prohibition not only applies to situations with tangible or economic discrimination but also to situations where sexual harassment is so severe or pervasive that it alters the conditions of the plaintiff's employment and creates a hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).

To show that Plaintiff was subject to a hostile work environment, she must prove that: (1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.  *Porter v. California Dep't of Corrections*, 419 F.3d 885, 892 (9th Cir. 2005).  A hostile work environment must be found to be "both subjectively and objectively offensive, one that a reasonable person would find hostile

or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  In determining whether the work environment reaches the level where it is considered to be hostile or abusive, courts are directed to look at all the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993).  Simple teasing, comments, and isolated incidents, unless extremely serious, will not amount to a hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Title VII is not designed to be a "general civility code." *Id*.  The conduct must be extreme in order to amount to a change in the terms and conditions of employment.  *Montero v. AGCO Corp.*, 192 F.3d 856, 860 (9th Cir. 1999).

The United States Supreme Court has recognized that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  The Ninth Circuit further elaborated on this holding by stating that plaintiffs do not have to prove that defendants had a specific intent to discriminate against women, but that "conduct may be 'unlawful sexual harassment even when harassers do not realize that their conduct creates a hostile working environment.'" *EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 844-45 (9th Cir. 2005) (quoting *Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991)).

When construing the evidence in a light most favorable to Plaintiff, the nonmoving party, the Court finds that there is substantial evidence to uphold the jury's verdict.  The following evidence was introduced at trial: Mr. Orsi repeatedly hugged and touched female employees,

including Plaintiff's daughter, in what others construed as a sexual manner; Mr. Orsi nick-named

Plaintiff  "half-rack;" Mr. Orsi asked Plaintiff out on dates; Mr. Orsi bragged about his sexual

exploits and told sexual jokes with others; while at work, Plaintiff saw a photograph of Mr. Orsi

simulating a penis with his finger through his zipper that was taken at a work-related event;

Plaintiff was referred to as "f-ing Sheryl" and her kids as "Sheryl's f-ing kids" by Mr. Orsi;

Plaintiff received a written warning for her attire after she had complained to her supervisors

about Mr. Orsi's conduct; she was basically told by her supervisors, Mary Crawford and Kelly

Van Winkle, to go along with Mr. Orsi's behavior; Mr. Orsi disparaged Plaintiff's credit at a

local paint store; Mr. Orsi told Plaintiff how to wear her hair.  Plaintiff testified that this conduct

occurred on a weekly basis.  Much of Plaintiff's testimony was corroborated by witnesses Pat

Stroud, Gary Leat, and John Folsum.  In viewing the totality of the evidence in a light most

favorable to Plaintiff, the Court finds that Plaintiff presented substantial evidence to support the

jury's conclusion that she was subjected to a hostile work environment.

## C.    Affirmative Defense

It is recognized that when there is no tangible employment action, an employer can be

vicariously liable for an actionable hostile work environment created by a supervisor with

immediate, or successively higher, authority over the employee.  *Ellerth v. Burlington Indus.,*

*Inc.*, 524 U.S. 742, 765 (1998).  However, the defending employer may raise an affirmative

defense to liability or damages, subject to proof by a preponderance of the evidence.  *Id*.  The

defense comprises two necessary elements:  (1) that the employer exercised reasonable care to

prevent and promptly correct any sexually harassing behavior, *and* (2) that the plaintiff employee

unreasonably failed to take advantage of any preventative or corrective opportunities provided

by the employer or otherwise to avoid harm.  *Id.*

The employer must show that it acted both to prevent *and* promptly correct the harassment.  *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 877 (9th Cir. 2001). Whether the employer has a stated anti-harassment policy is relevant to the first element of the defense.  *Id.*  In *Nichols v. Azteca Restaurant*, the Court noted that the employer had a written anti-harassment policy that: (1) defined sexual harassment; (2) set forth a reporting procedure; (3) stated that employees who violate the policy will be disciplined; and (4) assured employees that no reprisals would be made against them for making a complaint of sexual harassment.  *Id.* Accordingly, the court held that the employer had exercise reasonable care in preventing sexual harassment but went on to find that it did not exercise reasonable care in promptly *correcting* the sexual harassment.  *Id.*  The court found that the employer did nothing after the employee complained to his assistant and general managers[1] and although it took some action after he complained to human resources, its remedy fell short.  *Id.* at 876.

Defendant contends that it had a written sexual harassment policy and required all of its employees to undergo sexual harassment training which satisfies the first prong of the affirmative defense.  As to the second prong, the complaint that Plaintiff made to Bonnie Gunderson, who was in charge of Human Resources, consisted of the journal and complaints about reprimands regarding her dress attire.  Defendant submits that Plaintiff failed to report to any of the individuals named in the sexual harassment policy complaints of Mr. Orsi's language,

---

[1]  In that case, the court noted that these complaints did not follow the formal reporting requirements of the employer's anti-harassment policy but were sufficient to place it on notice of the harassment, recognizing that an employer's organizational structure is relevant to the determine the extent of its knowledge and the corporate structure was not so large to make it impractical for the managers to communicate matters of harassment.  *Id.* at 876, n. 10.

touching of female employees, or the nickname he had given her.  Lastly, Defendant argues that

Bonnie Gunderson and Ray Flaherty did conduct an investigation after receiving Plaintiff's

journal and concluded that many of the complaints were unsubstantiated.  The end result was

that Mr. Orsi was given a warning for his rough language.

Plaintiff testified that she never received the sexual harassment policy.  Additionally,

Plaintiff and others testified that they never received sexual harassment training.  Plaintiff also

contends that the evidence shows she made complaints to her supervisors,[2] Mary Crawford and

Kelly Van Winkle, about Mr. Orsi's behavior, including his language and touching, and nothing

was done about it.  Instead, she was told to "go along with it" and Mr. Orsi's treatment of her

worsened after she made this complaint.  Plaintiff testified that eventually she saw the sexual

harassment policy posted at the dealership and decided to turn over her journal with a letter to

those individuals listed in the policy.  Plaintiff contends that although Bonnie Gunderson and

Ray Flaherty stated they conducted an investigation, she was never told that her complaints were

being investigated.  Other employees testified they were not interviewed about the complaints

even though they were mentioned in the journal.  The investigation notes indicate that Ms.

Gunderson spoke with Mr. Orsi, Plaintiff and John Folsom.  Plaintiff submits that the evidence

showed that the policy was not implemented, there was not a "real" investigation, and that Mr.

Orsi received a "sham" warning, which Ken Smith testified was given just to appease Plaintiff.

The Court finds that there was substantial evidence during the trial for the jury to find

---

[2]  There were two sexual harassment policies entered into evidence at trial.  One policy states that if a person believes they are being sexually harassed, they should confront the harasser.  If they do not want to do to that, then they can bring it to the attention of either Michelle Dahl, Roy Dickinson, Ken Smith, or Bonnie Gunderson.  Lastly, if inadequate action is being taken, they should bring it to the attention of any officer of the company.  Exhibit 101.  The other sexual harassment policy provides that if the employee believes they are being sexually harassed they should contact their supervisor and if they are not comfortable doing that, to contact any manager or officer.  Exhibit 102.

**Memorandum Decision and Order - Page 8**

that the affirmative defense was not satisfied.  There was substantial evidence from which the jury could determine that either, or both, of the prongs were not satisfied.  The jury could have found that although Defendant did have a sexual harassment policy, it was not acting to prevent sexual harassment because Plaintiff never received the policy and there was testimony that sexual harassment training did not occur.  Additionally, there was substantial evidence that even in light of the sexual harassment policy, Defendant did not act to promptly correct the sexually harassing behavior.  Plaintiff testified that no action was taken when Plaintiff complained to her supervisors, Mary Crawford and Kelly Van Winkle, instead they told her to "go along with it." Then, when Plaintiff did make a formal complaint to Human Resources, a thorough investigation was not conducted and Mr. Orsi just received a "slap on the wrist."  The jury could have reasonably concluded that these actions were not sufficient to satisfy the first prong of the affirmative defense.

Additionally, there was substantial evidence that the jury could have found the second prong was not satisfied.  Plaintiff testified of making complaints to her supervisors and did give the journal and letter to Human Resources Manager Bonnie Gunderson.  The jury could have found that Plaintiff did not unreasonably fail to take advantage of any preventative/corrective opportunities.  There was substantial evidence to support the jury's determination that the affirmative defense was not satisfied.

The Court finds that judgment as a matter of law is not proper nor is a new trial warranted because both the findings of a sexually hostile work environment and that the affirmative defense was not satisfied are supported by substantial evidence.

**Memorandum Decision and Order - Page 9**

D.    **Punitive Damages**

42 U.S.C. § 1981a(b)(1) provides that punitive damages may be recovered "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  The Supreme Court found that the employer's behavior need not have to be "egregious" to meet this standard.  *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 534-35 (1999).   Instead, punitive damages will be awarded in cases of intentional discrimination where an employer discriminates in the face of a perceived risk that its actions will violate federal law.  *Id*. at 534.  The terms "malice" and "reckless" focus on the employer's state of mind, that is, its knowledge that it may be acting in violation of federal law.  *Id*.

There are some instances in which intentional discrimination will not give rise to punitive damage liability.  *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 515 (9th Cir. 2000).  First, if the theory of discrimination advanced by the plaintiff is sufficiently novel or poorly recognized, then the employer could believe its action was legal.  *Id*.  Second, if the employer believed it had a valid bona fide occupational qualification (BFOQ) defense to its conduct.  *Id*.  Third, in some situations, albeit rare, the employer could actually be unaware of Title VII's prohibition against discrimination.  *Id*.

In addition to meeting this standard, the plaintiff must also impute liability for punitive damages to the employer.  *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1197  (9th Cir. 2002).  This can be done through traditional agency principles, *e.g.*, "that a managerial employee acted within the scope of his or her employment."  *Id*.

An affirmative defense to punitive damage liability exists where the defendant shows its

good faith efforts to comply with Title VII, "if such efforts were contrary to the actions of its managerial agents." *Id*. at 1197-98.  Not only must the employer show it has an anti-discrimination policy, but that it has implemented the policy in good faith.  *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 517 (9th Cir. 2000).  The purpose of Title VII would be "undermined if those policies were not implemented and were allowed instead to serve only as a device to allow employers to escape punitive damages for the discriminatory activities of managerial employees." *Id*.

Defendant submits that even if Mr. Orsi's conduct is found to be actionable, that the basis for imposing liability based on his conduct is novel and/or poorly recognized and therefore there should be no punitive damage liability.  Defendant also argues that there is no basis for imputing punitive damages to the employer because it must be shown that the employer was aware of the specific discriminatory conduct at issue and acted with malice or reckless indifference.  Defendant also maintains it had a bona fide policy against discrimination.

Plaintiff submits there is substantial evidence in support of the jury's finding of malice or reckless indifference.  This includes that Plaintiff's managers, Mary Crawford and Kelly Van Winkle, took no action after Plaintiff complained of Mr. Orsi's behavior and that they instead acquiesced in his behavior.  Additionally, Mr. Orsi was never effectively punished for his conduct and Ken Smith condoned the behavior.  Additionally, Plaintiff asserts other evidence submitted at trial supports the punitive damage award.  She maintains there was evidence from which the jury could conclude that Ken Smith fabricated a story about finding Plaintiff in her pajamas and smelling of alcohol at work and that he attempted to bribe a witness, Kelly Van Winkle.  Plaintiff maintains this is additional evidence of malice.  *See Passantino*, 212 F.3d at

**Memorandum Decision and Order - Page 11**

516 (in discussing punitive damages, the court noted that jury could have found defense witnesses lied at trial about their actions).

The Court disagrees with Defendant that this case involved novel or unresolved theories of discrimination.  As for Defendant's other argument regarding its knowledge of the discriminatory conduct, the subjective state of mind element for punitive damages liability requires that the employer is aware of anti-discrimination laws and acts in the face of this awareness.  *See Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1199 (9th Cir. 2002).  The Ninth Circuit noted that other circuits have found punitive damage awards appropriate where it has been demonstrated that the defendants were aware of anti-discrimination principles.  *Id*. at 1198. There is substantial evidence to find that Defendant was aware of anti-discrimination principles; the company had an anti-harassment policy in its employee manual and Mr. Orsi and other employees testified they were aware of it.  After reviewing the evidence in a light most favorable to Plaintiff, the Court finds there is also substantial evidence that Defendant acted in the face of this awareness by ignoring Plaintiff's complaints, not fully investigating the complaint made to Human Resources, and giving Mr. Orsi a meager warning only for use of rough language.  *See Rowe v. Hussmann Corp.*, 381 F.3d 775, 784 (8th Cir. 2004) ("Recklessness and outrageousness may be inferred from evidence of management's participation in the discriminatory conduct or where an employee's repeated complaints to supervisors fall on deaf ears") (internal citations and quotation marks omitted).

An affirmative defense does exist for punitive damage liability that Defendant attempts to invoke by stating it had a bona fide policy against discrimination and did not ignore Plaintiff's complaint.  Defendant did have an anti-harassment policy.  However, there is no evidence that

Plaintiff knew of the policy and her employment file does not reflect that she received the employee manual containing the policy.  While hotly disputed between Plaintiff's witnesses and Defendant's witnesses, there was testimony that sexual harassment training was not provided. The employer must show it implemented its policy in good faith.  *See Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 517 (9th Cir. 2000).  As with the affirmative defense to the hostile work environment claim, there is substantial evidence from which a jury could reasonably conclude that the policy, although it existed, was not implemented in good faith.  It must be shown that Defendant made efforts to implement its policy, through education of its employees and active enforcement of its mandate.  *See Lopez v. Aramark Uniform & Career Apparel, Inc.*, 426 F. Supp. 2d 914, 964 (N.D. Iowa 2006).

After Plaintiff handed over her journal over to management, she was never informed of the progress of the investigation nor was she questioned thoroughly about her allegations and the jury could have found that crucial individuals were omitted from the investigation.  Lastly, even though Mr. Orsi did receive a written warning for his use of profanity, evidence was introduced that Ken Smith only gave this warning to appease Plaintiff.  There is substantial evidence that the jury could have relied on to impute liability to Defendant and find that Defendant did not make a good faith effort to comply with Title VII despite its anti-discrimination policy.

**E.    Amount of Punitive Damages**

Defendant asserts that the punitive damage award was excessive and either should be the basis for a new trial or reduced because it violates due process.  A jury award of punitive damages, if supportable, should not be lightly disturbed.  *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 707 n.3 (9th Cir. 1989).  The United States Supreme Court has held that an award

of punitive damages violates due process if "grossly excessive."  *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562 (1996).  The Supreme Court announced three "guideposts" to determine whether a punitive damage award is excessive.  *Id*. at 574-75.  These are:  (1) the degree of reprehensibility; (2) the disparity between harm suffered and the punitive damage award; and (3) the difference between this remedy and civil penalties authorized or imposed in comparable cases.  *Id*.

> **1.      Degree of Reprehensibility**

In evaluating the reprehensibility of the conduct, the court should look at whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health and safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003).

Defendant submits that Plaintiff suffered no physical harm nor severe emotional harm as evidenced by the nominal damage award and there is no evidence that Defendant acted with an indifference to the healthy or safety of others.  As for financial vulnerability, Defendant points out that the Court has found Plaintiff suffered no economic loss.  Defendant also argues that there was no regular sexually hostile conduct directed at Plaintiff and no evidence that Mr. Orsi was motivated by malice, trickery, or deceit.

On the other hand, Plaintiff asserts that although there was no physical harm, there is evidence of an indifference to the health and safety of others because Plaintiff was subjected to humiliating and degrading behavior by Mr. Orsi and Defendant through its inaction.  Plaintiff

also submits she was financially vulnerable because as a single mom of three children, she could not just walk away from her job.  Lastly, she contends that the conduct was not a mere accident but a result of intentional malice against Plaintiff; there was a repetition of conduct and a lack of response to it.

Although the harm in this case was not physical and did not involve any violence, it did include a violation of Title VII, an act intended to protect one's civil rights.  *See Zhang v. American Gem Seafoods*, 339 F.3d 1020, 1043 (9th Cir. 2003) (". . . intentional discrimination is a different kind of harm, a serious affront to personal liberty.")  The conduct that occurred was not a single isolated incident nor the result of mere accident or negligence.  While the conduct might not reach the level of being the most reprehensible conduct possible, it is not harmless behavior either.  This guidepost alone does not weigh in favor of reducing the award.

### 2.    Comparable Civil Penalties

This guidepost instructs the court to consider the difference between the award of punitive damages and the civil penalties authorized or imposed in comparable cases.  *BMW of North America v. Gore*, 517 U.S. 559, 575 (1996).  Depending on a company's size, Title VII's statutory cap provisions allow for the sum of compensatory and punitive damages to reach a maximum amount anywhere from $50,000 to $300,000.  42 U.S.C. § 1981a(b)(3).  The statutory cap in this case would be $200,000.

As to this guidepost, Defendant submits it cannot find cases with similar facts where liability was imposed and punitive damages assessed.  It also submits what is more telling is the lack of cases awarding punitive damages solely on an award of nominal damages, particularly in the Ninth Circuit.  Plaintiff points to the statutory cap of $300,000 and contends this guidepost

weighs against reduction of the award.  Several courts in § 1981 cases have analogized to the statutory damages cap imposed in Title VII cases when analyzing this guidepost.  In enacting the statutory cap, Congress set forth the maximum amount of punitive damages allowable for Title VII violations.  The amount awarded in this case does not exceed the statutory maximum.

### 3.        Ratio of Punitive to Compensatory Damages

The Supreme Court has instructed that punitive damages must bear a reasonable relationship to compensatory damages.  *BMW of North America v. Gore*, 517 U.S. 559, 580 (1996).  The Supreme Court has also recognized that a bright-line cannot be drawn between what is a constitutionally acceptable ratio and what is a constitutionally *un*acceptable ratio.  *Id*.  at 582-83.  In *BMW v. Gore*, the Supreme Court noted that the 500 to 1 ratio of punitive damages to compensatory damages was "breathtaking."  *Id*. at 583.  A subsequent Supreme Court case noted that although it would not create a concrete constitutional limit, few awards exceeding single-digit ratios between compensatory and punitive damages would satisfy due process.  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 410 (2003).  Particularly in cases of substantial compensatory damages, lesser ratios could reach the outermost limit of due process guarantees.  *Id*.

In a § 1983 case that resulted in a ratio of 200,000 to 1, the Second Circuit held that where compensatory damages are nominal, a much higher ratio can be contemplated.  *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996).  The use of a multiplier to assess punitive damages is not the best tool in those cases.  *Id*.  Instead, the court must look to punitive damage awards in other civil rights cases to find limits and proportions.  *Id*.  That court noted that civil rights violations are precisely the type of cases where a higher ratio may be justified, as noted by the

**Memorandum Decision and Order - Page 16**

Supreme Court in *BMW v. Gore*, because the acts are  "particularly egregious," result only in a "small amount of economic damages," or have injuries whose monetary value is "difficult to determine."  *Id*.  That court ultimately reduced the punitive damages award to $75,000.  *Id*. at 813.

       Defendant submits that the conduct in this case is not as egregious as other Title VII cases and that no economic loss was suffered.  Additionally, it contends that injury would not be hard to detect because it would be depicted by a drop in Plaintiff's sales, which did not occur. Defendant asserts the value of non-economic harm would not be difficult to determine, it just so happens that Plaintiff did not submit evidence of it.

       Defendant argues that there is a lack of Ninth Circuit precedent on whether punitive damages can be awarded in cases where only nominal damages are awarded.  Several circuits have provided that punitive damages are available absent an award of actual damages in Title VII, or analogous, cases.  *See Timm v. Progressive Steel Treating*, 137 F.3d 1008 (7th Cir. 1998); *Alexander v. Riga*, 208 F.3d 419 (3d Cir. 2000); *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352 (2d Cir. 2001).  However, other circuits have in Title VII, or analogous, cases held the opposite.  *See Kerr-Selgas v. Am. Airlines, Inc.*, 69 F.3d 1205 (1st Cir. 1995); *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298 (5th Cir. 2000); *People Helpers Found., Inc. v. City of Richmond*, 12 F.3d 1321 (4th Cir. 1993).  The Ninth Circuit has not addressed this issue.  *See Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493 (9th Cir. 2000).  In *Passantino*, the defendant, citing the jury instructions from the trial, argued that under Title VII a plaintiff may not recover punitive damages without establishing liability for either compensatory *or* nominal damages.  *Id*. at 514.  The court ultimately sidestepped the issue because the jury had

awarded compensatory damages.  *Id.* at 515.  Before doing so, it did note that the Ninth Circuit

has held in § 1983 cases that punitive damages may be awarded in the absence of compensatory

or nominal damages.  *Id.* at 514.  *See Gill v. Manuel*, 488 F.2d 799, 802 (9th Cir. 1973); *Bise v.*

*Int'l Brotherhood of Electrical Workers*, 618 F.2d 1299, 1305-06 (9th Cir. 1979).  The Court

finds the former authority cited above and the Ninth Circuit's rulings in § 1983 case to be

persuasive**.**

Plaintiff argues that if an injury is primarily personal, a greater ratio may be appropriate,

that there are no bright-line rules when it comes to ratios, and higher ratios may be warranted

when acts are egregious, the injury is hard to detect, or the amount of damages is difficult to

determine.  Plaintiff contends that in a case such as hers, where there is intentional

discrimination as opposed to purely economic harm, a higher ratio is appropriate.  Society has a

great interest in combating discrimination and intentional discrimination is a type of harm that is

a serious affront to personal liberty.  As noted by the Second Circuit, a multiplier is not the best

tool in nominal damage cases.  Plaintiff submits that the statutory cap is the device in place to

address concerns of awarding punitive damages without proof of harm, not remittitur.  *See Cush-*

*Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir. 2001) (finding that "to make enforcement

of the jury's award of punitive damages turn on whether the jury also awarded purely symbolic

nominal damages carries a likelihood of defeating the jury's intention as a result of confusion.")

Lastly, Plaintiff submits that Defendant's wealth can be a factor in assessing the ratio.

In a Ninth Circuit case involving race discrimination in which $35,000 in compensatory

damages and $1,000,000 in punitive damages were awarded, the court noted that it was the type

of case described by the Supreme Court in *BMW v. Gore*, a low award of compensatory damages

supporting a higher ratio of punitive damages because of the egregious conduct and the difficulty

determining harm.  *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001).  This was

particularly true because the injury was primarily personal.  *Id.*  The Ninth Circuit held that a

defendant's wealth could be a factor in assessing the ratio.  *Id.* at 818-19.  After noting the

"breathtaking 500 to 1" found by the Supreme Court in *BMW v. Gore*, the Ninth Circuit stated it

would not find comfort in "trying to discern parameters from other cases because the

circumstances vary so widely."  *Id.* at 819.  Ultimately, the Court upheld the award.  *Id.* at 820.

If a single digit multiplier was applied in this case, Plaintiff would receive $1.00 in

nominal damages and, at most, $9.00 in punitive damages.  This somewhat ridiculous outcome

demonstrates why multipliers in these types of cases are not appropriate.  As the Supreme Court

recently stated in *Exxon Shipping Co. v. Baker*, "the consensus today is that punitive damages

are aimed not at compensation but principally at retribution and deterring harmful conduct."  128

S.Ct. 2605, 2621 (2008).  "[H]eavier punitive damages awards have been thought to be

justifiable when wrongdoing is hard to detect . . ., or when the value of injury and corresponding

compensatory award are small. . ."  *Id.* at 2622.

The Court also finds the case from the Second Circuit, *Cush-Crawford v. Adchem Corp.*,

to be particularly instructive.  271 F.3d 352 (2d Cir. 2001).  In that case, the plaintiff was

subjected to persistent sexual harassment by a supervisor, including repeated telephone calls

asking her on dates, telling her she was beautiful and sexy, trying to kiss her, booking only one

hotel room for the both of them on business trips, complaints about her job performance when

she rejected him, among other things.  *Id.* at 354-55.  The plaintiff testified at trial that she

notified company officials about the harassment in September 1993, over a year before it took

any remedial action. *Id.* at 359. Ultimately, the jury found that there was a hostile work environment, awarded no compensatory damages and $100,000.00 in punitive damages. *Id.* at 356. The jury rejected the claims of retaliation and quid pro quo harassment. *Id.* The defendant appealed the verdict and award of punitive damages. *Id.* With regard to lack of compensatory damages, the court held: "There is some unseemliness for a defendant who engages in malicious or reckless violations of legal duty to escape either the punitive or deterrent goal of punitive damages merely because either good fortune or a plaintiff's unusual strength or resilience protected the plaintiff from suffering harm." *Id.* at 359. The court also addressed whether the employer's conduct warranted a punitive damage award, noting that although the defendant's theory of the case was that the "plaintiff did not effectively notify company officials of the sexual harassment until November 1994 and that the earlier complaints had really been complaints about other problems . . . the jury could have rationally credited plaintiff's version that, in spite of her complaints to company officials, the company did nothing to protect her from the abuse for many months." *Id.*

In this case, the Court trusts the sound judgment of the jury who attentively listened to the testimony over the course of the trial. The jury clearly found that Plaintiff had not suffered compensatory damages. But on the other hand, they also found that the Defendant had not exercised reasonable care in implementing its anti-discrimination policy. There is also evidence that would support the jury's decision to award $100,000 in punitive damages since the conduct was performed by her immediate supervisor and when she reported it to her other two female supervisors, she was told to "go along with it." Finally, the jury could have found that Defendant's investigation of her allegations was not conducted in good faith, but only to appease

Plaintiff and that Mr. Orsi suffered no real adverse personnel actions because of his conduct. The Court finds that the jury's verdict and award of punitive damages is supportable by the record and should not be disturbed.  *See Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 707 n.3 (9th Cir. 1989).

## III.
## Motion for Attorneys' Fees

A plaintiff in a civil rights suit is a prevailing party and is entitled to an award of attorneys' fees if he "has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing the suit.'"  *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990) (quoting *Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782 (1989)); 42 U.S.C. § 2000e-5(k).  The degree of a plaintiff's success does not affect the eligibility for an award of fees.  *Texas State Teachers Ass'n*, 489 U.S. 782, 790 (1989). The jury rendered a verdict in the amount of $100,001 in Plaintiff's favor and accordingly, she is the prevailing party.

The determination of a reasonable fee award is a two-step process.  *Hensley v. Eckerhart,* 461 U.S. 424 (1983).  First, the Court must calculate the "lodestar figure" by taking the number of hours reasonably expended on the litigation and multiplying it by a reasonable hourly rate.  *Id.* at 433.  In calculating the lodestar, the court must consider those factors identified in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975) which have now been subsumed within the initial calculation.  *Cunningham v. County of Los Angeles*, 879 F.2d 481, 487 (9th Cir. 1988). Subsumed factors include: (1) novelty and complexity of the issues; (2) special skill and experience of counsel; (3) quality of the representation; (4) the results obtained; and (5) the superior performance of counsel.  After calculating the lodestar, the fee may be adjusted by any

nonsubsumed factors identified in *Kerr*.[3]  *Id.*

## A.     Hourly Rate

Plaintiff contends that the rates of counsel correspond with the prevailing rates in North Idaho for similar lawyers of comparable skill, experience, and reputation.  Plaintiff also asserts that the use of current rates, rather than historical rates, should be used in calculating the lodestar amount in light of the totality of the circumstances and the delay in payment.  These current rates are $230/hour for partners and $200/hour for associates.  In 2005, Plaintiff's counsel charged $150/hour for partners and $130/hour for associates; in 2006, $175/hour for partners and $150/hours for associates; and in 2007, $200/hour for partners and $175/hour for associates.

The party seeking an award of fees should submit evidence supporting the rates claimed. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The determination of a reasonable hourly rate is guided not by the rates actually charged but the rate prevailing in the community for "similar work performed by attorneys of comparable skill, experience, and reputation."  *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 908 (9th Cir. 1995).  Plaintiff has submitted satisfactory

---

[3]  A "rote recitation of the relevant factors is unnecessary" so long as the district court adequately explains the basis for the award. *O'Neal v. City of Seattle*, 66 F.3d 1064, 1069, n.5 (9th Cir. 1995).  The *Kerr* factors are:

    (1) the novelty and difficulty of the questions involved;
    (2) the skill requisite to perform the legal service properly;
    (3) the preclusion of other employment by the attorney due to acceptance of the case;
    (4) the customary fee;
    (5) whether the fee is fixed or contingent;
    (6) the time limitations imposed by the client or the circumstances;
    (7) the amount involved and the results obtained;
    (8) the experience, reputation, and ability of the attorneys;
    (9) the nature and length of the professional relationship with the client;
    (10) the time and labor required;
    (11) similar awards in similar cases; and
    (12) the undesirability of the case.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (1975).

**Memorandum Decision and Order - Page 22**

evidence of the prevailing market rate in the community.

Regarding the issue of whether current rates or historical rates should be used for calculation, the Supreme Court has recognized that "[h]ours that are not properly billed to one's *client* also are not properly to one's *adversary* pursuant to statutory authority." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (emphasis in original) (internal quotations omitted). However, current rates or an appropriate adjustment for delay in payment may be reasonable. *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989).  The Ninth Circuit has held that a district court may compensate delay in payment in one of two ways:  "(1) by applying the attorneys' current rates to all hours billed during the course of litigation; or (2) by using the attorneys' historical rates and adding a prime rate enhancement." *In re Washington Public Power Supply System Securities Litig.*, 19 F.3d 1291, 1305 (9th Cir. 1994).

Plaintiff's counsel has been working on this case since November 2005, nearly three years, without payment.  Based on the delay in payment and the authority cited above, the Court will use the current rate in calculating the lodestar amount.

**B.     Number of Hours Expended**

The party seeking the award should submit evidence supporting the hours worked and rates claimed. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Hours that were not "reasonably expended" can be excluded from this initial calculation. *Id*. at 434.  These includes hours that are excessive, redundant, or otherwise unnecessary. *Id.*

Defendant argues that the hours expended by Plaintiff's counsel, 567.10 hours, are excessive, especially in light of the fact that defense counsel spent 425 hours on the case. Plaintiff's counsel attests in his affidavit that he edited the time to eliminate duplication and for

matters on which summary judgment was granted in Defendant's favor.  *Affidavit of Marc A. Lyons*, Docket No. 96, ¶ 8.  Defendant contends that hours expended by Ms. Linscott and Mr. Gorman should be reduced due to their relative inexperience as attorneys.  Defendant also asserts the issues were not novel or difficult and there is a plethora of Title VII cases within the Ninth Circuit.

More specifically, Defendant objects to time entries relating to the settlement/mediation, issues on which Defendant prevailed at summary judgment and matters unrelated to the lawsuit and/or claims not brought in this suit.  Defendant submits that several time entries for discovery and the summary judgment motion should be reduced to no more than one-third of that time since it was Defendant that prevailed on two out of the three claims at summary judgment. Other items Defendant believes should be excluded are: time spent on the motion in limine since Defendant prevailed on most issues, time spent re-drafting documents, unnecessary telephone conferences, and time entries where two attorneys were performing the same task, including trial preparation and attendance.

There are several time entries in which two attorneys are billing for the same work - including reviewing orders from the court, telephone conferences, and trial preparation and attendance.  The Court recognizes that while sometimes having two attorneys is warranted, other times it is unnecessary.  The Court will take the amount of hours spent by Ms. Linscott[4] on trial preparation that also overlap with hours expended by Mr. Lyons (73.6 hours) and deduct half (36.8 hours).  Another 6.7 hours of Ms. Linscott's hours will be deducted for work billed by two

---

[4] The Court will be deducting Ms. Linscott's hours which are charged at a lower rate.

**Memorandum Decision and Order - Page 24**

attorneys.[5]  Plaintiff has included billing unrelated to the case, such as entries relating to the

*Heustis* case, and a potential claim by another party.  The Court will deduct this time (6.1 hours[6])

from the overall award.  The Court will also deduct half the time spent (.7 hours) on telephone

conferences between January 5 and March 28, 2007, noting that the number of telephone

conferences seems excessive.  As for the time spent on the mediation/demand for settlement,

Defendant does not offer any authority in support of its argument that this time should be

excluded.  Time spent on settlement appears to be reasonable even though it was ultimately

unsuccessful.  The Court will deduct a total of 50.3 hours.

       Another factor subsumed within the initial lodestar calculation that may require the fee to

be adjusted upward or downward is the  "results obtained."  *Hensley v. Eckerhart*, 461 U.S. 424,

434 (1983).  The Supreme Court noted that this factor is "particularly crucial where a plaintiff is

deemed 'prevailing' even though he succeeded only on some of his claims for relief."  *Id*.  Two

questions must be addressed: (1) did the plaintiff prevail on claims that were unrelated to the

claims on which he succeeded?; (2) did the plaintiff achieve a level of success that makes the

hours reasonably expended a satisfactory basis for making a fee award?  *Id*.  Where a plaintiff

presents distinctly different claims for relief based on different facts and legal theories, work on

an unsuccessful claim "cannot be deemed to have been expended in pursuit of the ultimate result

achieved."  *Id*. at 434-35 (internal quotation marks and citation omitted).  On the other hand,

where a plaintiff's claims for relief involve a common core of facts or related legal theories, it is

---

[5]  On 1/17/06, 5/31/06, and 7/25/07.

[6]  The Court calculated the time spent on unrelated items to be 6.1 hours, not 12.4 as set forth by Defendant.
Specifically, on 12/8/05: .6 hours; 12/14/05: 1.9 hours; 3/1/06: .3 hours; 3/14/06: .1 hours; 3/16/06: .1 hours; 1/8/07:
.1 hours; 4/11/07: .9 hours; 4/12/07: .2 hours; 5/2/07: .5 hours; 6/25/07: .7 hours; 6/26/07: .5 hours; 7/9/07: .2 hours.
All of these hours, with the exception of 12/8/05, were expended by Ms. Linscott.  The 12/8/05 entry was for work
performed by Rudy Verschoor.

difficult to divide the hours on a claim-by-claim basis.  *Id*. at 435.  The Supreme Court went on

to recognize that the hours expended by a plaintiff who has achieved only partial success may

lead to an excessive fee award.  *Id*. at 436.  In such a situation, the district court "may attempt to

identify specific hours that should be eliminated, or it may simply reduce the award to account

for limited success."  *Id*. at 436-37.

Plaintiff brought claims for sexual harassment, retaliation, and gender discrimination.

The retaliation and gender discrimination claims were dismissed at summary judgment and a

verdict was returned in Plaintiff's favor on the sexual harassment claim following a jury trial.

These three claims did, for the most part, involve a common core of facts and it would be

difficult to parse out time spent on the two unsuccessful claims in order to arrive at an award for

time expended only on the successful claim.  This is the type of case envisioned by the Supreme

Court in *Hensley v. Eckerhart* when it stated "[m]uch of counsel's time will be devoted generally

to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis."  *Id*.

at 435.

However, while it not possible in this case to divide the hours on a claim-by-claim basis,

the Court must look at the overall relief Plaintiff obtained in relation to the hours expended on

the litigation.  Defendant argues that the time expended prior to the summary judgment order

should be reduced by two-thirds to reflect the limited success as Plaintiff only prevailed on one

out of three claims.  This argument overlooks the fact that these three claims were derived from a

common set of facts.  Much of the time prior to summary judgment would be difficult to divide

on a claim-by-claim basis because the time was dedicated to the litigation as a whole.  However,

the overall relief obtained by Plaintiff was less than the relief sought.  The total hours expended

**Memorandum Decision and Order - Page 26**

by Plaintiff's counsel do not correspond to the results obtained.

The Court finds that reducing the fee award by 20% is appropriate in this case. Although some of her claims were dismissed, Plaintiff did succeed on a related claim and receive $100,000 in punitive damages. *See Gates v. Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992) (finding that the district court is not required to set forth an hour-by-hour analysis of the fee request but can make "across-the-board percentage accounts either in the number of hours claimed or in the final lodestar figure"); *Greater Los Angeles Council on Deafness v. Community Television of Southern California*, 813 F.2d 217, 222-223 (9th Cir. 1987) (awarding plaintiffs 40% of the total lodestar amount to account for their limited success).

The amount of fees will first be reduced by $10,060.[7]  The amount submitted by Plaintiff's counsel, $118,943,[8] reduced by $10,060 is $108,883.  Next, the Court will reduce this amount by 20% for partial success.  The final amount to be awarded is $87,106.40.

## C.     Adjustment

There is a strong presumption that the lodestar calculation is a presumptively reasonable fee. *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000).  It should only be adjusted in rare and exceptional cases. *Id*.  The lodestar amount may be adjusted due to factors not subsumed in the initial calculation. *Id*.  The Court does not find it necessary to adjust the lodestar figured based on any special circumstances.  As noted above, the Court already considered the "results obtained" in calculating the reasonable hours expended.  The Court will

---

[7] Ms. Linscott'sand Mr. Verschoor's rates were both $200/hour.  That rate multiplied by the 50.3 hours gives a total amount of $10,060.

[8] This amount includes the estimated time for work on post-trial motions submitted in the Lyons Affidavit, Docket No. 96-2.

**Memorandum Decision and Order - Page 27**

not further reduce the lodestar amount.

**D.     Costs**

In addition to the taxable costs allowed by 28 U.S.C. § 1920, Plaintiff seeks nontaxable costs for long-distance telephone expenses ($17.97), photocopies ($413.00), Westlaw research charges ($2,524.95), and out-of-pocket expenses paid to the expert witness Claire Cordon for consultation, report preparation, preparation of trial testimony and trial testimony ($12,874.71 - $669.71 (as a matter of right) = $ 12,205.00).   Defendant objects to Plaintiff's request for the costs of electronic legal research and the expert but does not object to the long-distance telephone costs and photocopies costs. Those will be awarded.

As for the computerized legal research, Plaintiff maintains that it is a necessity and typically billed as an expense to fee-paying clients.  Defendant maintains that these costs should not be allowed because the costs are typically a part of normal overhead and Plaintiff has not even attempted to show a billing statement to support the claim[9] or show that it is related to the causes of action on which Plaintiff prevailed.

It is well established that attorney's fees include reasonable out-of-pocket litigation expenses that would normally be charged to the fee paying client.  *See Harris v. Marhoefer*, 24 F.3d 16, 19-20 (9th Cir. 1994).  The Ninth Circuit has addressed the split among the circuits regarding whether expenses for computer-based legal research are compensable as reasonable attorneys' fees, noting that only the Eight Circuit had held that the cost of computer research could not be added to a fee award.  *Trustees of Const. Industry & Laborers Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1258 (9th Cir. 2006).   The Ninth Circuit endorsed the

---

[9]  Plaintiff has now provided a billing statement.  *See* Second Affidavit of Marc A. Lyons in Support of Motion for Attorney Fees and the Award of Costs and Expenses, Docket No. 109.

view of what it called "the growing circuit consensus" that computer-based legal research costs should be treated the same as attorneys' fees and are recoverable if separate billing for such expenses is the "prevailing practice in the local community."  *Id*. at 1259. (quoting *Missouri v. Jenkins*, 491 U.S. 274, 287 (1989)).

Plaintiff's counsel attests that his firm includes the apportioned computerized legal research for its regular fee paying clients and in his opinion, this is a normal and appropriate practice.  Defendant indirectly contests that is the normal practice, claiming that most law firms contract for electronic research at a flat monthly rate, but Defendant's counsel has not gone so far as to state they do not bill their clients in a fashion similar to what Plaintiff's counsel utilizes. Therefore, the Court will allow computerized research in the amount of $2,524.95, finding it to be a reasonable amount.

In regard to the expert witness fee, 42 U.S.C. § 2000e-5(k) provides that the court may, in its discretion, "allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs . . ."   Courts have interpreted the statute to provide that the expert fees must be reasonable.  *See Wilcox v. Station Lumber, Inc.*, 921 F. Supp. 837 (D. Me. 1996); *Kerr-Selgas v. American Airlines, Inc.*, 1994 WL 528068 (D.P.R. 1994).

Plaintiff seeks expert fees in the amount of $12,205.00.  Plaintiff has already reduced the charges on Mr. Cordon's first bill dated August 1, 2006 by half as it included time spent on another case.  In preparation for and actually testifying in February 2008, Ms. Cordon billed 38.10 hours on the second invoice, which also included travel time from Seattle to Coeur d'Alene.  Ms. Cordon was on the stand for less than two hours during the trial.  Prior to trial, the Court issued an order limiting the matters Ms. Cordon could testify on from her expert report.

The Court finds that based on the limitations imposed on her testimony and the actual time spent on the stand, the hours billed by Ms. Cordon for trial preparation and testimony are excessive. The Court will reduce these hours in half to arrive at a reasonable amount of expert fees. Expert fees in the amount of $7,442.50[10] will be awarded to Plaintiff.

## ORDER

Based upon the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)      Defendant's Renewed Motion for Directed Verdict or, in the Alternative, Motion for New Trial and/or Remittitur (Docket No. 91), filed March 27, 2008, is **DENIED**;

2)      Plaintiff's Motion for Fees and Costs (Docket No. 94), filed March 31, 2008, is **GRANTED IN PART and DENIED IN PART.**

3)      Plaintiff is awarded attorneys' fees in the amount of $87,106.40 and costs in the amount of $10,398.42.



DATED: July 31, 2008

_____
Honorable Mikel H. Williams
United States Magistrate Judge

---

[10]   The fees for trial preparation on the second invoice totaled $9,525.00.  Reduced in half, this amount was $4,762.50 which was added to the first invoice amount of $2,800.00, plus travel costs in the amount of $191.55 and $358.16.  The amount allowed as costs as a matter of right, $669.71, was deducted, leading to a total amount of $7,442.50.